# United States Court of Appeals
## For the First Circuit

Nos. 13-2285
    13-2289
    13-2291
    13-2320

UNITED STATES OF AMERICA,

Appellee,

v.

PEDRO LUIS RAMÍREZ-RIVERA, a/k/a Peter Pai;
JOSÉ LAUREANO-SALGADO, a/k/a Geo; and
ISMAEL E. CRUZ-RAMOS, a/k/a Chapu,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge,
 Hon. William E. Smith, U.S. District Judge]

Before

Thompson, Lipez, and Barron,
Circuit Judges.

Henry E. Marines, with whom Law Offices of Henry E. Marines, Claudia Ima, and Law Offices of Claudia Ima were on brief, for Pedro Luis Ramírez-Rivera and José Laureano-Salgado.
Ruth M. Liebesman, with whom Law Office of Ruth M. Liebesman was on brief, for Ismael E. Cruz-Ramos.
Victor O. Acevedo-Hernandez, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Francisco A. Besosa-Martínez,

Assistant United States Attorney, were on brief for the United States.

---

August 26, 2015

---

**THOMPSON, Circuit Judge.** After a jury convicted Defendants-Appellants José Laureano-Salgado, Pedro Ramírez-Rivera, and Ismael Cruz-Ramos (collectively, "the Defendants")[1] of numerous drug and gun crimes, a district court judge sentenced them all to life in prison. The Defendants now ask us to overturn their convictions and sentences, or, at the least, send their case back for a new trial.

For the reasons discussed below, we reverse Cruz-Ramos's conviction and sentence and remand his case for a new trial. We

---

[1] Laureano-Salgado and Ramírez-Rivera filed a joint brief, and Cruz-Ramos filed a separate brief. Laureano-Salgado and Ramírez-Rivera sought to join Cruz-Ramos's arguments and vice-versa. But Laureano-Salgado and Ramírez-Rivera attempted to do so only by stating (in their reply brief) that "to the extent they are applicable" they "join the arguments raised . . . [by] co-appellant Cruz-Ramos."

While Federal Rule of Appellate Procedure 28(i) permits co-appellants to "adopt by reference a part of another's brief," as we have reminded litigants in the past, "[a]doption by reference cannot occur in a vacuum and the arguments must actually be transferable from the proponent's to the adopter's case." United States v. Brown, 669 F.3d 10, 16 n.5 (1st Cir. 2012). Therefore, where, as here, an appellant "offer[s] no explanation as to why [his co-appellant's] arguments pertained to him," such "textbook perfunctory" treatment waives the appellant's attempts to adopt-by-reference his co-appellant's arguments. Id. (emphasis omitted); see also United States v. Espinal-Almeida, 699 F.3d 588, 599 n.9 (1st Cir. 2012) (a criminal defendant's mere statement that he "joins in any and all other arguments raised by the other criminal co-defendants that are applicable to his case" is not sufficient (alterations omitted)).

Because we find that none of Laureano-Salgado and Ramírez-Rivera's arguments are meritorious, we need not address whether Cruz-Ramos (who did a little more than a bare-bones statement) effectively joined his co-Defendants' arguments.

affirm Laureano-Salgado's and Ramírez-Rivera's convictions and sentences.

## BACKGROUND

To give a lay of the land, we start with only a brief overview of this case. We fill out relevant portions of the story -- in, as we invariably explain, whatever light our law demands, and relying on whatever record support is appropriate -- as they are needed throughout our analysis of the various issues the Defendants have raised.

### How It Began[2]

Until 2004, the majority of street-level drug sales in the San Juan-metropolitan area of Puerto Rico were controlled by gangs operating out of public housing projects. Sales in each housing project were generally controlled by each project's own drug gang.

The name of the game back then was control of the drug points, and the gangs fought for decades to maintain and grow their territories. The violence that accompanied their disputes naturally drew the attention of both local and federal authorities. As a result, drug sales took a hit, and large conspiracy indictments were handed down.

---

[2] Because we provide this basic factual background only to frame the case, we pulled some of these particular facts from the allegations made in the indictment, while other facts we gleaned from pre-trial and trial testimony.

Around 2004, nearly all the drug gang leaders from the area reached an agreement that to reduce the inter-project conflicts and keep the cops away, they would form an alliance. They named it "La Organización de Narcotraficantes Unidos" (Spanish for "The Organization of United Drug Traffickers"), or "La ONU" for short. The leaders agreed that if a conflict arose among La ONU members, they would meet to discuss it (as opposed to immediately resorting to shootouts). Under the new regime, La ONU members would be permitted to visit other La ONU-affiliated housing projects (and to also sell drugs there), so long as they got permission from that project's leader. The La ONU leaders also met regularly to discuss drug-related issues and to resolve conflicts.

While the alliance operated "for a time," for reasons unknown it "weakened" as certain gangs grew "disgruntled" with La ONU and "sought to break off." Sometime around 2008, La ONU ended up breaking into two groups -- La ONU and "La Rompe ONU" (known as "La Rompe" for short, which translates to "the break"). Each project-gang went all-in with either La ONU or La Rompe. La ONU-controlled projects included Las Dalias, Las Gladiolas, El Prado, and Los Jardines de Selles, while La Rompe-controlled projects included Trujillo, Cupey, and Alturas de Cupey. The two factions soon became equally sized and eventually, they became bitter rivals.

With the rising of La Rompe, La ONU's direction changed. Its mission became to "maintain control over the drug points in their housing projects by force and to kill La Rompe members and leaders in order to expand." The organization's "unwritten" rules required that La ONU members remain loyal to each other, while relentless to the enemy. La ONU members could not kill other La ONU members without go-ahead from the leadership; nor could they overtake La ONU-owned drug points. Not only were La ONU members forbidden from associating with La Rompe members, they were also required to kill them on-sight. La ONU members were not permitted to cooperate with law enforcement. And breaking any of these rules meant death to the traitor (and/or his family members).

LA ONU leaders continued to meet with each other to resolve internal conflicts and discuss strategy for overtaking drug points at other (La Rompe-controlled) housing projects. They regularly pooled resources to buy weapons and cars. When attacks on La Rompe members would go down, each La ONU project contributed an enforcer (i.e., hit man).

La ONU also continued to traffic drugs (crack, cocaine, heroin, and marijuana) and committed various violent acts (including murders) to enforce its rules and grow its territory. For instance, La ONU put hits out on La Rompe leaders. La ONU launched machine-gun shootouts in La Rompe projects. During one such shootout near Trujillo Alto Bridge, two women -- a police

officer and librarian -- were killed.  La ONU was also connected to the May 2010 shooting take-down of a police helicopter, allegedly committed by Edwin Bernard Astacio Espino ("Bernard"), a La ONU member.

Betraying La ONU called for an equally devastating fate. For instance, when a La ONU member stole a gun and gave it to a La Rompe member, he too, was killed.  So was a La ONU leader who got caught stealing drugs from the organization, and a member who cooperated with police.

After the helicopter shooting, an arrest warrant was issued for Bernard (whom the police apparently could not find). The police caught a lucky break in August 2010, when an informant tipped them off that Bernard was hiding out at Cruz-Ramos's house, stashing weapons and drugs.  Afraid they would miss the chance to arrest Bernard if they waited any longer, the police searched Cruz-Ramos's house (without a warrant), found Bernard, arrested him (and the several other people in the house, including Cruz-Ramos), and seized the drugs and guns they found at the home.  Police also arrested other La ONU members for various crimes around 2010 to 2011.

### The Crackdown

With that, in March 2012, a grand jury indicted 33 people for their alleged involvement in La ONU from 2004 through March

2012.[3] The charges included drug trafficking, firearms crimes, murder, and attempted murder. The indictment accused all the Defendants of being members of La ONU.

Amongst the indictment's 33 counts, the Defendants here were charged with five:

- Count 1: racketeering conspiracy from 2004 through March 2012, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d);

- Count 2: conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 860;

- Count 3: conspiracy to possess firearms during and in relation to narcotics trafficking offenses, in violation of 18 U.S.C. § 924(o);

- Count 29: violent crime in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) (specifically, for the August 2010 murder of Christian Toledo-Sánchez, known as "Pequeque"); and

---

[3] The original indictment named 32 people, but a few months later the government filed a superseding indictment and added an additional defendant.

- 8 -

- Count 30: use and carry of a firearm in relation to a crime of violence (i.e., Pequeque's murder), in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j)(1).[4]

### Pre-Trial Motions

Puerto Rico District Court Judge José A. Fusté was assigned to preside over the 33-person case, but at some point the indicted defendants were split up into two groups for purposes of trial (one group being the defendants who were facing the death penalty, and the other group being the defendants who were not). Judge Fusté presided over the trial of the death-eligible defendants, and Judge William E. Smith, a Rhode Island district judge, sat in designation to preside over the trial of the non-capital defendants (including Cruz-Ramos, Laureano-Salgado, and Ramírez-Rivera).[5] Judge Smith also addressed many of the numerous pre- and post-trial issues that arose for the non-capital group.

---

[4] The Defendants were also charged under 18 U.S.C. § 2, the aiding and abetting statute, for each of these counts. It provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[5] Par for the course, most of the indicted defendants pleaded out prior to trial.

As motion practice took way, and as jury selection in the Defendants' case lingered imminent, the government asked the district court to empanel an anonymous jury because the Defendants were "part of an organized crime ring that is both willing and able to intimidate and harm jurors."[6] Over the Defendants' constitutional objections, Judge Fusté (who was in charge of jury selection, even though he did not preside over the non-capital Defendants' trial) allowed the motion in-part, and resolved to place the seated jurors' names, addresses, and places of employment under seal because the Defendants in fact had "shown that they are part of an organized crime ring that is both willing and able to intimidate and harm jurors." The judge also ordered the jurors not to divulge information during voir dire that would disclose their identities.

Shortly after that motion was resolved, the government notified the Defendants and the court that it intended to offer as evidence at trial the firearms and drugs that police seized from Cruz-Ramos's home in August 2010. Cruz-Ramos moved to suppress all that evidence, arguing that the warrantless search of his home

_____

[6] 28 U.S.C. § 1863(b)(7) allows district courts to empanel anonymous juries "where the interests of justice so require."

was illegal. After a two-day evidentiary hearing, Judge Smith denied in-part the motion to suppress.[7]

### Jury Empanelment

Judge Fusté empaneled the jury for the non-capital trial on January 23, 2013, several days before the trial was scheduled to start.[8] The instant Defendants and their attorneys were present for jury selection.

During voir dire (i.e., the process during which the court questions the potential jurors to determine whether they are fit to sit on the jury), Judge Fusté informed the potential jurors that their names, addresses, and places of employment would be kept anonymous, and that they would each be assigned an identifying number to "ward off curiosity and seekers of information that might otherwise infringe on [their] privacy."

The judge asked the jurors numerous questions during voir dire, and instructed them to raise their hands if the answer was "yes" to any of the questions, after which point the court would individually address their concerns. Among numerous other topics, the judge asked a question about the jurors' familiarity with the 2010 police helicopter shooting. He informed the jurors

---

[7] Judge Smith announced his decision on the motion to suppress at the Defendants' pre-trial conference and later issued a detailed written ruling.

[8] Judge Smith was listening in remotely, but did not participate during the jury selection.

that while La ONU was "associated" with the incident, the shooting would not come up during the trial because the Defendants were not charged with that shooting. Some of the jurors raised their hands in response to the question, and the judge followed up with them individually.

After voir dire concluded, the jury (including alternates) was selected. But a few days before the start of trial, Juror No. 30 wrote a letter to the court asking to be excused because she was experiencing anxiety from having to sit on the jury. In response, the Defendants asked the court to conduct further voir dire of all the empaneled jurors, contending that Juror 30 could have "infected" the other jurors "by creating bias against" them.

Judge Fusté decided to interview Juror 30 (outside of the Defendants' presence, though their lawyers were allowed to be there) and concluded that she was unfit to serve on the jury for mental health reasons (essentially, she was intimidated by the Defendants). After the interview, Judge Fusté dismissed the juror and replaced her with an alternate. He also denied the Defendants' request to individually poll the other empaneled jurors.

### The Trial and Sentencing

Judge Smith got started with the Defendants' trial on February 7, 2013. Among the evidence the government presented was

testimony from law enforcement and cooperating La ONU members, as well as physical evidence police seized, like guns and drugs.

After seven days, the jury convicted the Defendants on all counts. The Defendants then moved for either an acquittal or a new trial based on lack of sufficient evidence, pursuant to Federal Rules of Criminal Procedure 29(a) and 33. Judge Smith denied the motions, finding that the government's presentation of witness testimony and physical evidence "strongly supported" the convictions. In October 2013, Judge Smith sentenced all the Defendants to life in prison.[9]

Now on appeal the Defendants argue that numerous errors occurred prior to and during the trial, such that their convictions should be vacated -- or at the least that they should get a new trial. Assuming those arguments do not convince us, the Defendants further argue that their sentences were improper for various reasons.

We address each of the Defendants' many arguments in turn.

---

[9] The judge gave Cruz-Ramos and Laureano-Salgado the same sentence -- 40 years on Count One, 10 years on Count Two, 20 years on Count Three, and life on Count 29, to run concurrently. He also imposed 20 years to run consecutively on Count 30.
Ramírez-Rivera got the same sentence, with the only difference being a 25-year term on Count 30.

- 13 -

## DISCUSSION

### I.    Sufficiency of the Evidence

We begin our task by addressing whether the evidence put before the jury was sufficient to convict the Defendants.  We tackle this issue first because if the Defendants are right, the remedy is about as drastic as they come -- we would have to throw out their convictions, and because of the Double Jeopardy Clause of the Fifth Amendment, the government would not get another shot at re-trying them on these charges.  See United States v. Negrón-Sostre, 790 F.3d 295, 306-07 (1st Cir. 2015).  Of course, a successful sufficiency challenge would then render all the Defendants' other claims (of reversible trial and sentencing error) moot.

We review sufficiency challenges de novo.  Id. at 307. We consider all the direct and circumstantial evidence in the light most flattering to the government, "drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendants guilty beyond a reasonable doubt."  Id. (internal quotation marks and alteration omitted).  Essentially, "we will reverse only if the verdict is irrational."  United States v. Brandao, 539 F.3d 44, 50 (1st Cir. 2008) (internal quotation marks omitted).

In reviewing sufficiency challenges, we consider whether all the evidence offered by the government and admitted by the court was sufficient for a guilty verdict, even if the court erroneously admitted some of that evidence.[10] Lockhart v. Nelson, 488 U.S. 33, 34, 40-41 (1988).

Turning now to the evidence, there's no question that the government's case against the Defendants (particularly when it came to Laureano-Salgado and Ramírez-Rivera) heavily relied on testimonial evidence from three cooperating witnesses who were arrested around 2011 for their involvement with La ONU -- Christian Figueroa-Viera, a hit man and "leader" for La ONU; José Gutierrez-Santana, known as "El Domi," who sold drugs for the organization; and Wesley Figueroa-Cancel, also known as "Hueso," who was also a La ONU leader.

The allegations in the indictment largely ended up panning out at trial. According to the witnesses' testimony, from around 2007 to 2011, La ONU operated as a "union" or "gang" of

---

[10] The logic behind this rule is that "a reversal based solely on evidentiary insufficiency has fundamentally different implications, for double jeopardy purposes, than a reversal based on such ordinary trial errors as the incorrect receipt or rejection of evidence." Lockhart v. Nelson, 488 U.S. 33, 40 (1988) (internal quotation marks omitted). That is, "[w]hile the former is in effect a finding that the government has failed to prove its case against the defendant, the latter implies nothing with respect to the guilt or innocence of the defendant, but is simply a determination that [he] has been convicted through a judicial process which is defective in some fundamental respect." Id. (internal quotation marks omitted).

drug dealers from several housing projects (including Las Dalias, Las Gladiolas, El Prado, and Los Jardines de Selles), which had the goal of "control[ling] the other housing projects and thus have more power."  La ONU's main rival was La Rompe, which controlled projects like Trujillo, Cupey, and Alturas de Cupey.

The two gangs were at "war" over the "control of the drug points."  Dominating the drug points was important to La ONU for a simple reason: by eliminating the competition in the La Rompe-controlled projects, La ONU could earn more drug money.

To effectuate its goals, La ONU had rules.  If you see an enemy, kill him.  Don't cooperate with police.  And don't associate with the enemy.  The punishment for breaking a rule was death.

The evidence showed that La ONU walked the walk, and not only were La Rompe members attacked and killed, disloyal La ONU were in fact punished by death.  For instance, around 2008 or 2009, a La ONU member stole a rifle and gave it to a La Rompe member. After he confessed to giving the rifle to the enemy, La ONU members killed him.  In 2009, a La ONU leader was killed for stealing drugs from the organization.  And yet another La ONU member was killed for cooperating with police.  The witnesses testified that it was important to participate in these types of violent acts to maintain their status with La ONU, even though that might mean killing police officers.  It was necessary for members to maintain their

positions in La ONU because "once you join the organization, you can't get out."

The testimony also demonstrated that Defendant Ramírez-Rivera was the heroin point owner in both Las Gladiolas and Las Dalias, as well as a La ONU leader. Ramírez-Rivera was so high up in the organization that without his permission, "nothing could be done," according to Gutierrez-Santana. And Ramírez-Rivera ordered other La ONU members to kill La Rompe associates. In addition to supplying heroin, weapons, and ammunition to the organization, Ramírez-Rivera also provided the cash to buy weapons and cars. And he sometimes lent his own gun to La ONU members when they went to other projects for a shooting.

From around 2008 to 2011, Defendant Laureano-Salgado served as Ramírez-Rivera's drug runner (meaning he brought product to drug points and picked up the money the drug points earned), and was a cocaine point owner at Las Gladiolas.

Defendant Cruz-Ramos was a heroin point owner at Las Gladiolas and provided firearms to the La ONU members who were from Las Gladiolas. He also lent weapons, including an AK-47, to other La ONU members.

To prepare for shootouts, La ONU generally held meetings, which were always conducted by the same people (including Cruz-Ramos, Ramírez-Rivera, and Laureano-Salgado).

The government also elicited testimony about several La ONU-sanctioned murders, but at trial the Defendants were only directly implicated in one -- the murder of La Rompe boss Christian Toledo-Sánchez, a.k.a. Pequeque. The testimony reflected that in August 2010, La ONU put a hit out on Pequeque. A meeting (which the Defendants participated in) was held to hash out the details of the murder with the for-hire hitman, whose grandmother was Pequeque's neighbor. During the attack on Pequeque (who was, in fact, killed), the hitman was injured, and the Defendants were part of the extraction team that went in to rescue him.

### A.    RICO Conspiracy (Count One)

Given that evidentiary backdrop, we first address the sufficiency of the evidence as to the Defendants' RICO conspiracy conviction under 18 U.S.C. § 1962(d).

The Racketeer Influenced and Corrupt Organizations Act, or "RICO," makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) also prohibits any person from conspiring to violate § 1962(c). "The major difference between a violation of § 1962(c) itself and a violation of § 1962(d) based on § 1962(c) is the

additional required element that the defendant knowingly joined a conspiracy to violate § 1962(c)."  United States v. Shifman, 124 F.3d 31, 35 (1st Cir. 1997) (citation and alterations omitted).

Thus, "[f]or a defendant to be found guilty of conspiring to violate RICO, the government must prove (1) the existence of an enterprise affecting interstate [or foreign] commerce, (2) that the defendant knowingly joined the conspiracy to participate in the conduct of the affairs of the enterprise, (3) that the defendant participated in the conduct of the affairs of the enterprise, and (4) that the defendant did so through a pattern of racketeering activity by agreeing to commit, or in fact committing, two or more predicate offenses."  Id. (internal quotation marks and alteration omitted).

Here, the Defendants argue that the evidence was not sufficient for elements one, three, and four.[11]  For the reasons discussed below, we find no merit to this claim.

---

[11] It's not clear from the Defendants' briefing which RICO elements they actually grieve, but we interpret the substance of their arguments to concern elements one, three, and four.  To the extent the Defendants did intend to dispute the second element (knowledge), "[a]ll that is necessary to prove this element of the RICO conspiracy is to prove that the defendant agreed with one or more co-conspirators to participate in the conspiracy."  United States v. Shifman, 124 F.3d 31, 38 (1st Cir. 1997) (internal quotation marks and alterations omitted).  Our overall discussion of the RICO count makes abundantly clear why this argument would have failed in any event.

<u>Enterprise Affecting Foreign Commerce</u>

To start off, the Defendants' argument that the government presented insufficient evidence that La ONU was a RICO enterprise affecting interstate or foreign commerce carries no water. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Thus, an enterprise "need only be a group of persons associated together for a common purpose of engaging in a criminal course of conduct," and "need not be a legitimate business or a form of organization sanctioned by state law." <u>United States</u> v. <u>Nascimento</u>, 491 F.3d 25, 32 (1st Cir. 2007) (internal quotation marks omitted).

Still, even though such an "association in fact" suffices to satisfy the "enterprise" requirement, <u>see</u> 18 U.S.C. § 1961(4), the law is clear that "the government nonetheless must prove that the enterprise existed in some coherent and cohesive form." <u>Nascimento</u>, 491 F.3d at 32. "It follows that the enterprise must have been an 'ongoing organization' operating as a 'continuous unit.'" <u>Id.</u> (citation omitted). Put simply, a RICO enterprise "possesses some goal or purpose more pervasive and more enduring than the instant gratification that can accrue from the successful completion of each particular criminal act." <u>Id.</u>

Here, the government presented more than sufficient evidence that La ONU operated as an enterprise. Even if the Defendants are correct that La ONU started off as a truce between the different housing-project gangs, those groups concertedly combined their efforts for a specific, ongoing purpose -- in the beginning, to sell drugs, and later, to also stomp out the competition (specifically, La Rompe). This super-gang, if you will, although a merging of smaller gangs that still operated their existing drug points, became "ongoing and identifiable" by its name; the organization even had a special hand gesture (i.e., gang sign). See United States v. Patrick, 248 F.3d 11, 19 (1st Cir. 2001) (finding that an enterprise existed where the "gang was ongoing and identifiable" by name and gang sign). La ONU also had rules and structure. Truant members and enemies were killed, but not before leaders first signed off on the killings. Before committing acts of violence on behalf of the organization, members had to get permission from La ONU leaders, who hosted meetings to discuss shootouts before they were carried out. See id. (taking into account that the enterprise "had 'sessions' where important decisions were made, including decisions about taking action against rival drug dealers").

Therefore, while the Defendants urge that the La ONU organization did not have all the traditional indicia of a typical street gang (e.g., use of colors, initiation rites, and a formal

hierarchy), as the Supreme Court has pointed out, RICO's "enumeration of included enterprises is obviously broad, encompassing 'any . . . group of individuals associated in fact.'" Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting 18 U.S.C. § 1961(4)). "The term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." Id. (citation omitted). As we fleshed out above, La ONU "exhibited group cohesion over time; its membership pooled and shared resources; the individuals involved had a sense of belonging and self-identified as [La ONU] members; and the group had a well-honed set of goals." Nascimento, 491 F.3d at 33. We deem that more than enough for a RICO enterprise. See id.

Further, we also easily find that La ONU engaged in or conducted activities that affected foreign commerce.[12] See 18 U.S.C. § 1962(c). We have said before that an enterprise's effect on commerce need only be de minimis, given that the commerce requirement is only jurisdictional. United States v. Marino, 277 F.3d 11, 35 (1st Cir. 2002). Gutierrez-Santana testified that during his time as a La ONU member from about 2009 until his arrest in 2011, he imported kilos of heroin from the Dominican Republic to provide to La ONU drug points (and in particular to Ramírez-

---

[12] The Defendants argued this point in their briefing, but this was one of many arguments the government ignored. Even without help from the government, though, we conclude that the commerce element was easily satisfied.

Rivera).  This activity is sufficient to satisfy RICO's foreign commerce requirement.

## Participation

RICO also requires the government to prove that the Defendants participated in the conduct of the enterprise's affairs.  According to the Supreme Court, that means "participation in the operation or management of the criminal enterprise." Shifman, 124 F.3d at 35-36 (quoting Reves v. Ernst & Young, 507 U.S. 170, 184-85 (1993)).  It suffices for this element that a defendant be "plainly integral to carrying out the enterprise's activities."  Id. at 36 (internal quotation marks omitted).

Despite the Defendants' attempts to dilute the rather damning evidence of their active leadership roles in La ONU, we find that this element was also clearly satisfied.  As we discussed above, the testimony reflected that all three Defendants owned drug points in La ONU-controlled projects.  Of course, drug-point ownership was a vital component to the La ONU conspiracy, given that the whole point of the enterprise was to maintain control of as many drug points as possible to earn more money.  On these facts alone, we conclude the jury had abundant reason to find that the Defendants were integral parts of the enterprise's activities.

## Pattern of Racketeering

Finally, the Defendants contend that there was insufficient evidence that they participated in the conspiracy by

agreeing to commit (or actually committing) a pattern of racketeering activity. Not so.

To satisfy the "pattern" element for a RICO conspiracy, the statute requires that "a defendant agreed with one or more others that two predicate offenses be committed." Shifman, 124 F.3d at 35 (internal citation and alteration omitted). RICO specifically enumerates what counts as a "predicate offense," and includes (among many other crimes) murder and drug dealing. See 18 U.S.C. § 1961(1). "Aiding and abetting one of the activities listed in § 1961(1) as racketeering activities makes one punishable as a principal and amounts to engaging in that racketeering activity." Shifman, 124 F.3d at 36 (citing 18 U.S.C. § 2).

RICO also requires that the defendant commit the two racketeering acts within 10 years of one another. 18 U.S.C. § 1961(5). Additionally, the Supreme Court has said that the "acts must be related and 'amount to or pose a threat of continued criminal activity.'" Shifman, 124 F.3d at 36 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

We conclude that the evidence was sufficient for the jury to find that each of the Defendants participated in La ONU by agreeing to engage in a pattern of racketeering. First, despite the Defendants' representation to the contrary, there was witness testimony that all the Defendants were part of the 2010 planning

meeting for Pequeque's murder.[13]  The jury heard testimony that during the planning meeting, which Cruz-Ramos and Laureano-Salgado attended and Ramírez-Rivera participated by speakerphone, the leaders decided that Pequeque would be killed by a particular hitman with $10,000 of La ONU funds, as well as a La ONU-provided pistol and car.  The jury could easily infer, given the body of testimony they heard, that the reason for Pequeque's murder was to enforce La ONU's ongoing mandate that La Rompe members be executed, so that La ONU could expand its territory.[14]

Second, as we noted above, the record reflected evidence that each Defendant, as drug point owners, engaged in drug trafficking for La ONU-controlled drug points between 2007 and 2011.  See 18 U.S.C. § 1961(1) (listing "dealing in a controlled substance" as a RICO predicate).  The Defendants do not seriously

---

[13] The Defendants do not (nor could they successfully) argue that planning a murder is not a RICO predicate.  See 18 U.S.C. § 1961(1).

[14] The Defendants argue that the witnesses' testimony about the Defendants' attendance at the meeting was inconsistent, and at best questionable, as none of the witnesses were present during Pequeque's shooting.  But Figueroa-Cancel unequivocally testified that he was at the planning meeting and relayed the details of the planned hit.  The jury also heard that Pequeque was, in fact, killed by the hitman after the meeting, and that the Defendants were part of the team to extract the injured hitman from the scene. Even assuming the other witnesses' testimony was inconsistent with this account (or even if Figueroa-Cancel's other testimony conflicted with this account), "[w]hen there are two conflicting versions of a single event, it is for the jury to decide which version, if either, should be given credence." United States v. Williams, 717 F.3d 35, 40 n.2 (1st Cir. 2013).

dispute this point either, arguing only that their drug-selling at the individual drug points "did not contribute to La ONU's objectives" because the drugs were sold only for the benefit of the individual gangs at each housing project.

We have already rejected the Defendants' notion that selling at the individual housing projects did not contribute to La ONU's mission to take over the drug market, but even if the Defendants' sales did not directly financially benefit La ONU, their claim would still fail. It suffices that "the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of his association with the enterprise." Marino, 277 F.3d at 27. "[T]he defendant need not have channeled the proceeds of the racketeering activity into the enterprise," and "[i]t is unnecessary for the pattern of racketeering to have benefitted the enterprise in any way." Id. at 28. Particularly given the ensuing "war" with La Rompe over the drug points, the jury could have reasonably inferred that the Defendants' drug-trafficking success (i.e., their ability to survive) was attributable to their alliance with, allegiance to, and high-ranking status in La ONU.

All in all, the RICO conviction stands.

## B.   VICAR (Count 29)

In a similar vein, the Defendants unconvincingly argue that the jury heard insufficient evidence to sustain their

- 26 -

conviction for Violent Crime in Aid of Racketeering Activity ("VICAR") under 18 U.S.C. § 1959(a).

VICAR prohibits murder (or conspiracy to commit murder) "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity."[15] 18 U.S.C. § 1959(a). The predicate offense for the Defendants' VICAR conviction was Pequeque's murder (which the indictment charged as a violation of Puerto Rico law), and the Defendants once again argue that there was insufficient evidence that any of them were involved in that murder. But for the reasons discussed earlier we reject that argument, as the jury could have reasonably inferred that the Defendants themselves planned

---

[15] VICAR, 18 U.S.C. § 1959(a), provides, in relevant part:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—
>
> (1) for murder, by death or life imprisonment, or a fine under this title, or both.

Pequeque's murder. And that is sufficient for a murder conviction under Puerto Rico law. See Puerto Rico Penal Code Articles 105 and 106 (respectively, P.R. Laws Ann. tit. 33, §§ 4733, 4734 (2004).[16]

As to the second VICAR element, the Defendants have provided no developed reasoning as to why the trial evidence would not suffice to show at least part of their motive for the murder was to "advance or maintain their position within" La ONU. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting that undeveloped arguments are waived).[17]

We need not tarry on this point. The VICAR conviction stands.

---

[16] Article 105 defines murder as "kill[ing] another human being with intent." P.R. Laws Ann. tit. 33, § 4733. First-degree murder, Article 106, is (in relevant part) "[a]ny murder committed . . . with premeditation." P.R. Laws Ann. tit. 33, § 4734. "Any other intentional killing of a human being constitutes second degree murder." Id.
Liable as a principal under Puerto Rico law is anyone who "participates directly in the commission of a crime," "forces, provokes, abets or induces another person to commit a crime," or "cooperates before, simultaneously or after the commission of a crime, and without whose participation the crime could not have been perpetrated." P.R. Laws Ann. tit. 33, §§ 4671(a), (b), (d).

[17] Perhaps this omission was intentional, as it would be meritless on this record. See United States v. Tse, 135 F.3d 200, 206 (1st Cir. 1998) (holding that the government need not prove that advancement in the enterprise was a defendant's sole motive for committing the VICAR crime and that the government need only show that defendant committed the acts because "he knew it was expected of him by reason of his membership or that he committed the acts in furtherance of that membership" (internal quotation marks and alterations omitted)).

## C. Conspiracy to Possess Firearms (Count 30)

For the Defendants' last sufficiency challenge, they urge that they were improperly convicted of conspiring to possess firearms because none of the guns that were introduced or mentioned at trial actually belonged to La ONU.

18 U.S.C. § 924(o) provides that "[a] person who conspires to commit an offense under [18 U.S.C. § 924(c)] shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life."  And 18 U.S.C. § 924(c)(1)(A) provides a minimum imprisonment term for

> any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or . . . in furtherance of any such crime, possesses a firearm.

The Defendants argue that there was no evidence presented that they used or carried firearms "in furtherance" of a crime of violence or drug-trafficking crime, and that "mere presence of a firearm in an area where a criminal act occurs" does not suffice.  See United States v. Bobadilla-Pagán, 747 F.3d 26, 35 (1st Cir. 2014).  Again, the Defendants miss the mark.  "For

- 29 -

purposes of 18 U.S.C. § 924(c)(1)(A), we have understood 'in furtherance of' to demand [a] showing [of] a sufficient nexus between the firearm and the drug crime [or crime of violence] such that the firearm advances or promotes the drug crime [or crime of violence]." United States v. Gurka, 605 F.3d 40, 44 (1st Cir. 2010) (internal quotation marks omitted). Here, even if the guns put into evidence during the trial did not belong to the Defendants, the jury heard evidence that all the Defendants carried firearms and/or supplied them to the organization from 2008 to 2011. And the jury could easily conclude that given La ONU's mission to protect its drug territory, and its tendency to do so through gun violence, the firearms that drug point owners carried or provided to other members either advanced or promoted their drug-trafficking businesses. Thus, that no weapons were ever seized directly from Laureano-Salgado or Ramírez-Rivera is of no consequence when it comes to our sufficiency analysis -- "[t]estimony from even just one witness can support a conviction." Negrón-Sostre, 790 F.3d at 307 (internal quotation marks omitted).

In sum, we find that the evidence was abundantly sufficient to convict the Defendants of the contested crimes.

## II. **Reversible Trial Errors**

Because we find that the evidence presented to the jury was sufficient to support the Defendants' convictions, we now turn to the Defendants' allegations regarding supposed errors that

might warrant a new trial.  Specifically, Cruz-Ramos argues that the district court erred in denying the motion to suppress the August 2010 search of his home that led to his arrest, the seizure of numerous guns and large amounts of drugs, and the arrest of Bernard and several other people in the house.  The Defendants also collectively argue that the district court erred during jury selection and in making certain evidentiary rulings at trial.

## A.  Cruz-Ramos's Motion to Suppress

To start us off, Cruz-Ramos claims that the district court erroneously denied his motion to suppress the fruits of the 2010 police search of his home (and the car garaged there), as the police had no probable cause to enter his home without a warrant, let alone to search.  He also argues that the statements he made to police after the search (and his subsequent arrest) should also be suppressed as fruits of the poisonous search.

Because we agree with Cruz-Ramos that probable cause was lacking and therefore the search of the home and car violated the Fourth Amendment, we find that the evidence seized during the search should have been suppressed.  We also conclude that including the erroneously admitted evidence at trial was not harmless, given the lack of other compelling evidence linking Cruz-Ramos to drug crimes, and thus, a new trial for Cruz-Ramos is warranted.

<u>District Court Decision</u>

Based on the testimony from three law enforcement agents (the only witnesses to testify at the suppression hearing), the district court made the following factual findings. <u>See</u> <u>United States</u> v. <u>Beras</u>, 183 F.3d 22, 24 (1st Cir. 1999) ("In reviewing the court's denial of defendant's motion to suppress, we recite the facts as found by the district court to the extent they are not clearly erroneous.").[18]

On August 28, 2010, Puerto Rico Police Department Officer Carlos A. Jimenez-Rolon showed up at Las Dalias housing project around 2:30 a.m. to conduct a "preventative round" (Las Dalias had one of the highest crime rates of the island's housing projects). During the round, Officer Jimenez-Rolon saw a man walking. The Officer got out of his (marked) car and told the man to stop.

Instead of complying, the man took off running. Officer Jimenez-Rolon gave chase. The man reached into his pocket and threw an unidentified object toward the second story of the nearby building.

---

[18] While Cruz-Ramos additionally argues that some of the district court's factual findings were clearly erroneous, <u>see</u> <u>United States</u> v. <u>Brown</u>, 621 F.3d 48, 55 (1st Cir. 2010), we need not address that argument, as we conclude that even adopting the court's findings as-is, there was no probable cause to search.

Office Jimenez-Rolon realized he wouldn't be able to catch the fleer, so instead went to investigate what the man had purged from his pocket. Officer Jimenez-Rolon went up to the second floor of the nearby building and discovered a different man lying down (presumably in the hallway), with a firearm at his side. Officer Jimenez-Rolon arrested this man and took him to the police station.[19]

At the police station, Officer Jimenez-Rolon began to interview the arrested man. The arrestee told Officer Jimenez-Rolon that if the police could provide security to his family, he would tell them where to find Bernard, one of Puerto Rico's most-wanted fugitives for allegedly shooting down the municipal helicopter. Officer Jimenez-Rolon brought his supervisor, Lieutenant Luis David Flores-Ortiz, into the loop, and Lieutenant Flores-Ortiz agreed to the deal and continued with the interview. Lieutenant Flores-Ortiz had not met or spoken to the man prior to this encounter, and as far as the Lieutenant knew, the man had never previously served as an informant to the Puerto Rico police.

The arrestee (who we'll call from now on "the Informant") told Lieutenant Flores-Ortiz that Bernard was hiding at a house in

_____

[19] Among the other details that are difficult to gather from the police officers' story, it is unclear why the police arrested this man. The record does not reflect that he was charged with any crime (i.e., unlawful possession of a firearm), or that his tip, which we discuss shortly, was provided in exchange for prosecutorial leniency.

the Berwind Estates housing subdivision in Rio Piedras with at least four other people -- Cruz-Ramos, two females, and perhaps other unidentified males. Bernard would have on him "many weapons, firearms, and controlled substances," the Informant warned. Four rifles would also be hidden in a flower box on the terrace, and sidearms (like Berettas and Glocks) and drugs would be in a hidden compartment in a red Ford Expedition. The Informant did not provide any further details concerning what police would find at the home, nor a description of the house.

The Informant said Bernard wouldn't stick around for long and would depart at sun-up through the back of the house. The Informant further warned that Bernard would open fire at the police as soon as he saw them. Upon leaving the Berwind Estates home, Bernard would head for the Las Dalias housing project, the Informant claimed, "at which point the PRPD would lose their opportunity to arrest him" that night.

The brief interview ended sometime between 3:30 and 4:00 a.m. Despite the fact that neither the Puerto Rico police nor Lieutenant Flores-Ortiz had any prior relationship with the Informant, the Lieutenant deemed him reliable based on the fact that both the Informant and Bernard "came from the Las Dalias housing project, and thus the Informant could likely be part of Bernard's 'close-knit' group and know Bernard's whereabouts."

With that, shortly after the interview ended, Officer Jimenez-Rolon drove the Informant to the house where Bernard was supposedly located. After they reached Berwind Estates and passed a manned security hut, the Informant pointed out a "good-sized residence" with "lots of vegetation" behind and to the side of it. The vegetation was relatively thick, but someone hiding in the bushes could still be seen from certain angles. A terrace with a flower box was also visible.

Apparently satisfied with what he had observed, Officer Jimenez-Rolon took the Informant back to the police station, and around 5:00 a.m., the police returned to the house to arrest Bernard. They did not attempt to obtain either a federal or local search warrant to enter or search the home.

After the police secured the home's perimeter (and extended the perimeter out to the guardhouse), an "entry team" comprising six officers "entered through the property through the vegetation on the side of the house, crossed over the terra-cotta floored portion of the carport driveway, and proceeded to the door located on the side terrace." To enter the carport, the officers "had to jump a cement wall," and to enter the terrace, they opened a closed gate.

From the terrace, the officers saw through a window an unidentified female sitting in the kitchen. They told her they were police, instructed her to stay silent, and asked her to open

the door.  She complied.  They asked the woman where Bernard was, and she said he was in the bedroom.

While the police made their way to the bedroom, other men (including Cruz-Ramos) appeared out of adjacent rooms.  The officers detained them.  The police continued into the bedroom, where they found Bernard in a bed "either asleep or just half-awake."  Close by Bernard was a pistol.  They arrested him.  All of the detained people were also arrested for harboring a fugitive.

With everyone under arrest and the house secure, Officer Jimenez-Rolon searched the flower box on the terrace, where he found hidden under the dirt four rifles.  Then he went in the house, walked through the foyer and through a glass door that opened into the carport, where a red Ford Expedition was parked.  In the car, Officer Jimenez-Rolon found a hidden compartment with weapons, ammo, and drugs.  Officer Jimenez-Rolon seized all of the drugs and guns he found.

Cruz-Ramos, along with the other arrestees, was taken to the police department following his arrest.  Sometime between 10:30 a.m. and noon, Cruz-Ramos was placed in a "small room" with three federal agents for an interview, which was not recorded.  Cruz-Ramos was verbally apprised of his constitutional rights (particularly, his right to remain silent and his right to an attorney), and while he acknowledged that he understood them, he refused to sign any paperwork waiving his rights.

The police proceeded to interview Cruz-Ramos anyway, and he told the agents that he lived in the house where he and Bernard were arrested, but that he was originally from the Las Gladiolas housing project. He admitted to being "affiliated with a group of housing projects that were partners and supported each other." Cruz-Ramos also admitted to carrying a gun for personal defense and to having numerous rifles "hidden or buried somewhere." He told the agents that he knew Bernard because they hung out together in different bars, and Bernard was acquainted with his stepdaughter. Cruz-Ramos said he knew Bernard was wanted by the police and had tried to arrange for Bernard to find a lawyer and surrender himself.

Based on all these facts, the district court concluded that the police had probable cause to search Cruz-Ramos's home without a warrant. Specifically, the court found that "[a]lthough the Informant had never provided information before, and only offered the information upon his arrest and interrogation, all of the other facts and circumstances support the [police's] conclusion that the Informant was indeed truthful and reliable." Those facts were: the Informant was arrested in Las Dalias, "a housing project that Bernard was associated with"; the Informant provided very detailed information; the Informant agreed to travel with Officer Jimenez-Rolon to "point[] out the precise residence, which matched the description he had already provided"; and the

Informant put himself in danger by providing the tip. The court also found that exigent circumstances were present, namely, Bernard's risk of escape and the threat he posed to public safety.

Additionally, the court concluded that the warrantless search of the Ford Expedition was legal, as the Informant had provided a basis for probable cause that guns and drugs were hidden in it. While the court found no exigency, it nonetheless denied suppression of the car-search based on the "auto exception" to the warrant requirement. See United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011) (noting that under the "auto exception," if "there is probable cause to believe a vehicle contains evidence of criminal activity, agents can search without a warrant any area of the vehicle in which the evidence may be found" (internal quotation marks omitted)). Even if the automobile exception didn't apply though, the police made a "good faith error" because based on their "legal presence on [the] property, the probable cause known to them at the time, and the automobile exception, it was entirely reasonable for them to believe that the warrantless search of the Expedition was justified," the district court concluded. See Illinois v. Krull, 480 U.S. 340, 348-49 (1987) (recognizing that evidence resulting from a Fourth Amendment violation should only be suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment" (internal

quotation marks omitted)). The court did, however, exclude the search of the flower box, on the grounds that even though the police had probable cause, there were no exigent circumstances to justify searching there because Bernard had been arrested and the house was secure, rendering safety a non-issue. The court likewise excluded the fruits of the flower-box search (four rifles found under the dirt) because they dropped from a poisonous tree (the illegal search of the flower box), and no "good faith" exception applied.[20] See Wong Sun v. United States, 371 U.S. 471, 484 (1963) ("[E]vidence seized during an unlawful search [can]not constitute proof against the victim of the search.").

As for Cruz-Ramos's statement to the police, the court found that it could not be suppressed as fruit of the poisonous search because the search of the house was not poisonous (i.e., illegal). The court likewise rejected Cruz-Ramos's argument that his statement was not given voluntarily, which he said violated the Fifth Amendment.

### No Probable Cause

As we hinted at above, the focus of our analysis here is on whether the police had probable cause to search Cruz-Ramos's home. Cruz-Ramos argues that since the sole basis of probable

---

[20] The government does not dispute the suppression of the flower-box evidence.

cause was the uncorroborated tip from an unknown informant, the police needed more than just his word to search without a warrant.

"[W]e review de novo the district court's conclusions of law, including its application of the law to the facts, its probable cause . . . determination[], and the district court's ultimate legal decision to grant or deny the motion to suppress." United States v. Camacho, 661 F.3d 718, 724 (1st Cir. 2011). In assessing whether there was probable cause for a search, "our task, like that of the . . . district court, is simply to make a practical, common-sense decision whether, given all the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. McLellan, No. 14-1561, 2015 WL 4071914, at *4 (1st Cir. July 6, 2015) (internal quotation marks and alterations omitted).

We first provide a little background on the relevant law before diving into our analysis. The Fourth Amendment instructs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Based on this constitutional tenet, the law clearly establishes that even when police have a warrant to arrest someone, a search warrant is still "ordinarily required to enter the home of a third person to arrest an individual who is believed to be

inside the home." Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999).

"Nevertheless, a warrantless entry into a person's dwelling may be permitted" to effect an arrest, United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005), so long as two conditions are met: one, the police had probable cause to enter the home, and two, "exigent circumstances" existed, like a fugitive's threat to public safety. Hegarty v. Somerset Cty., 53 F.3d 1367, 1373-74 (1st Cir. 1995). And probable cause only "exists when the totality of the circumstances suggests that there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Gifford, 727 F.3d 92, 98 (1st Cir. 2013) (internal quotation marks omitted).

As was the case here, police often rely on tips from confidential informants to underlie probable cause. But the principle is long-standing that "[e]ven where a search warrant is obtained, the police must show a basis for the search beyond the mere fact of an assertion by an informer." Recznik v. City of Lorain, 393 U.S. 166, 169 (1968). It follows then that "[a]t least as much is required to support a search without a warrant." Id. at 169-70. Therefore, when, as here, "the primary basis for a probable cause determination is information provided by a confidential informant," law enforcement must "provide some information from which a [court] can credit the informant's

credibility." Gifford, 727 F.3d at 99. In other words, a "probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." Id. (internal quotation marks omitted).

To help assess an informant's reliability, we look to a "nonexhaustive" list of factors:

> (1) . . . the probable veracity and basis of knowledge of persons supplying hearsay information; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); and (4) whether a law enforcement [officer] assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011) (citations, internal quotations marks, and alterations omitted).

Applying these factors to the instant case, we find that there is simply no indication on this record that the police explored the Informant's basis of knowledge for the information he relayed, or that the police bothered to corroborate any of the information that actually suggested that criminal activity was afoot at Cruz-Ramos's home. Even if we were to agree with the district court that the information the Informant provided was detailed, we find that because the police did not sufficiently

test the reliability of the detailed information, the denial of the motion to suppress cannot stand.

Specifically, nothing in the district court's factual findings "indicates the informant's basis of knowledge," such as whether the informant had firsthand knowledge of Bernard's whereabouts (i.e., he had seen Bernard at the house), or just "heard about it as hearsay" or "through rumor." See Gifford, 727 F.3d at 100; cf. Illinois v. Gates, 462 U.S. 213, 234 (1983) ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case."). Notably, the only basis Lieutenant Flores-Ortiz articulated for trusting the Informant was that because he "came from" the same housing project as Bernard, "[h]e could form a part of [Bernard's] close-knit group." That inference could implicate every resident in the complex, yet Lieutenant Flores-Ortiz apparently never bothered to ask the Informant whether he actually was part of Bernard's crew. The Informant could have been relaying a rumor he overheard on the street, or even fabricating the information. It is also undisputed that the police here had no "past history with the informant to establish that informant's credibility." See Gifford, 727 at 100; cf. United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (that informant had given police "fruitful tips in the past" and police had met with the informant

before "in person on several occasions" supported the informant's reliability).

Furthermore, while the district court credited the police for corroborating the Informant's tips, our review shows that the only information the police actually corroborated before they entered the premises was the Informant's (very general) outside description of the house. Indeed, all the police did here before entering the premises was drive by the home and confirm the readily apparent details the Informant described -- that the home was in the gated community the Informant identified and had a flower box.

But this kind of information, indeed, the kind that is immediately visible to anyone who passes the house, is not -- without more -- useful information when it comes to making a probable cause determination. True, "corroboration of even innocent activity reported in [a] tip may support a finding of probable cause," at least when "[c]orroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." Tiem Trinh, 665 F.3d at 12 (internal quotation marks omitted). But the information must be at least marginally useful in establishing that criminal activity is afoot. See Alabama v. White, 496 U.S. 325, 332 (1990) (noting that it is "also important that . . . 'the anonymous tip contained a range of

details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted.'" (quoting Gates, 462 U.S. at 245)). Here, the police did not corroborate any of the information that might actually have suggested suspicious activity. For instance, one could find it curious to see multiple adults (at least one the Informant even identified by name) coming in and out of a single-family home. Or perhaps if the police had staked out the house, they might have seen someone protectively guarding or manipulating the flower box in an unusual way. Cf. id. at 11 (police conducted surveillance to corroborate much of the informant's information, including the fact that the informant had, multiple times, been in and out of the house where the purported drug operation was going down). In sum, we find that the police did not do enough to confirm the unknown Informant's story such that probable cause could issue.[21]

_____

[21] The fourth Tiem Trinh factor, whether the police officer assessed from his professional standpoint the "probable significance" of the tip, 665 F.3d at 10, is arguably met here because Lieutenant Flores-Ortiz did surmise that the Informant was reliable. However, we give his assessment little weight because the police knew nothing about the Informant other than his affiliation with Las Dalias and still did not inquire into the Informant's source of knowledge. Thus, the officer had no real basis for making his assessment.

The district court, relying on an out-of-circuit case, also emphasized that the Informant put himself in danger by providing the tip. See United States v. One 56-Foot Yacht Named Tahuna, 702 F.2d 1276, 1287 (9th Cir. 1983) (considering as a factor in the reliability analysis that "[t]he information was given to the

Our outcome should be no surprise, given our precedent. In addition to the test we laid out in Tiem Trinh, we have emphasized on multiple occasions that an informant's reliability must be vetted. For instance, in United States v. Jordan, we carefully weighed the police's efforts to corroborate a hearsay tip, and specifically noted some of the "various means" by which an informant could be corroborated, such as "direct surveillance or circumstantial evidence," "vouchsaf[ing]" by a "highly experienced law enforcement officer," "independent corroboration" (i.e., conducting controlled drug buys), and most particularly, the informant's history of providing "reliable information and investigative assistance to the police in the past." 999 F.2d 11, 13-14 (1st Cir. 1993). We found that on balance, all of these efforts on the part of the police sufficed to corroborate the informant's tip. In Dixon, the police officer took similar measure, meeting with the informant face-to-face "on several occasions," "independently corroborat[ing] facts," including not

---

government in circumstances subjecting the informants to possible personal or penal risk" (alterations omitted)). But even if we took into account the risk of retaliation the Informant faced, the record does not reflect that La ONU knew or would have been able to figure out that the (confidential) Informant was the one talking to police. If the Informant had heard the information through a rumor or eavesdropping, there would be no reason -- at least not one we can discern from this record -- to think the gang would suspect him. And we reiterate that the officers here did not probe the Informant's basis of knowledge (e.g., whether the Informant knew the information because he was in the gang and thus would be in danger because he cooperated).

only "innocent facts" like the defendant's phone number and car-type, but also by conducting controlled drug buys that "were carefully monitored and regulated to minimize the chance that the [informant] could have falsely implicated" the defendant. 787 F.3d at 59. Further, the informant in that case also had given "fruitful tips in the past." Id.

In contrast, anyone driving by Cruz-Ramos's home could parlay the generic description the Informant gave, and confirming only those innocuous details is not, on its own, sufficient to corroborate a tip from an unknown confidential informant. The Informant did not even say that the house was the only one in the area with a flower box, meaning that the flower box's existence did not make for a distinguishing characteristic. Given the lack of other indicia of the Informant's reliability, the police had an obligation to corroborate something of the tip before entering Cruz-Ramos's home without a warrant. See Recznik, 393 U.S. at 169 (finding that police did not have probable cause to enter a home when no "effort was made to show that either the petitioner or the apartment was at that time connected with" criminal activity, and the police did not "even attempt to establish that the informers were reliable"). In sum, there was no probable cause to search Cruz-Ramos's home.

Cruz-Ramos further asserts that the search of his car was also illegal for lack of probable cause. As we discussed

above, the Informant's tip was not sufficiently reliable on its own, and we agree with Cruz-Ramos that the same reasoning extends to the search of the Expedition. See United States v. Dickerson, 514 F.3d 60, 66 (1st Cir. 2008) (noting that police may only conduct "a warrantless search of a car if there is probable cause to believe" the car has "contraband or evidence of a crime" (emphasis added)). Contrary to the district court's decision, we conclude that the initial entry into the home was illegal, and so the police could not form probable cause from what illicit activity they observed once they entered the home. See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920) ("The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all."). Thus, there was no basis for probable cause to search the Expedition.

For the same reason, the so-called "automobile exception" to the Fourth Amendment does nothing to save the search of Cruz-Ramos's car (assuming the exception even applies to a car parked within the curtilage of a defendant's home, as was the case here). See Coolidge v. New Hampshire, 403 U.S. 443, 460-62 (1971). Sure, "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home," such that "warrantless examinations of automobiles have been upheld in

circumstances in which a search of a home . . . would not."[22]  South Dakota v. Opperman, 428 U.S. 364, 367 (1976).  However, police still need "probable cause to believe that the automobile contains contraband" before conducting a warrantless search.  United States v. Silva, 742 F.3d 1, 7 (1st Cir. 2014).  As with a home-search, in this context "[p]robable cause exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found."  Id. (internal quotation marks omitted and emphasis added).  As we discussed, the police did not probe the Informant's basis for his claims that weapons and drugs were in the car and therefore had no reasonable basis for believing the Informant's tip, such that probable cause could issue on the tip alone.

One final point on probable cause -- that the police actually did end up finding guns, drugs, and, of course, Bernard in Cruz-Ramos's home cannot enter our calculus, as "[a] search unlawful at its inception may [not] be validated by what it turns up."  United States v. Mercedes-De La Cruz, 787 F.3d 61, 69 (1st

---

[22] The logic behind this automobile exception is that "[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects."  South Dakota v. Opperman, 428 U.S. 364, 368 (1976) (internal quotation mark omitted).

Cir. 2015) (quoting Wong Sun, 371 U.S. at 484 (internal quotation marks omitted)).

Based on these facts,[23] we conclude that there was no probable cause to enter Cruz-Ramos's home or car. Thus, while we certainly understand (though we do not address whether) exigency may have been a legitimate concern here because of Bernard's status as a dangerous fugitive, the Constitution does not permit the police to forego a search warrant in situations like this based on exigency alone. Rather, as we have discussed, they also need probable cause. See Hegarty, 53 F.3d at 1373-74.

The Seized Physical Evidence

We must next consider whether the evidence seized as a result of the illegal search should also have been suppressed at trial. It is well established under the "exclusionary rule" that generally, "evidence seized during an unlawful search [can]not constitute proof against the victim of the search." Wong Sun, 371 U.S. at 484. That is, the government "may make no use of evidence illegally seized." Mapp v. Ohio, 367 U.S. 643, 657 (1961). It's clear, then, that per the plain language of the exclusionary rule,

---

[23] To the extent additional facts came out during the two-day evidentiary hearing that the district court did not address in its decision, the government did not point them out to us. Indeed, the government's curiously scant brief did not provide any developed argument as to the motion to suppress (as well as several other issues the Defendants raised), instead choosing to simply regurgitate large chunks of the district court's factual findings.

the physical evidence seized during the illegal search of Cruz-Ramos's home (including the car and flower box), should have been suppressed. The district court said as much when it determined that if the initial entry into Cruz-Ramos's home was illegal, "then everything subsequently discovered by the [police] would be subject to suppression as fruit of the poisonous tree."[24]

Like most rules, however, the exclusionary rule has exceptions. We examine their applicability next.

*Good-Faith Exception*

"Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." Davis v. United States, 131 S. Ct. 2419, 2428 (2011) (internal quotation marks and alterations omitted). This "good-faith" exception to the exclusionary rule dictates, then, that even when the seizure of evidence results from a Fourth Amendment violation, that evidence should only be suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Krull, 480 U.S. at 348-49 (internal quotation marks omitted).

---

[24] The government does not dispute this conclusion in its briefing.

- 51 -

We conclude that the good-faith exception does nothing for the government here.  For one, the government did not ask us to invoke the exception.  Cf. United States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013) (finding that a good-faith argument can be waived, at least when the government fails to raise it below); United States v. Archibald, 589 F.3d 289, 301 n.12 (6th Cir. 2009) (declining to address the good-faith exception where it had not been "raised, preserved, or argued by the government").  In fact, the government makes no argument concerning the good-faith exception at all, even though it "bears the heavy burden of proving that the good-faith exception applies."  Wurie, 728 F.3d at 13 (internal quotation marks omitted).

Regardless, the good-faith exception would not help the government in this case.  Lieutenant Flores-Ortiz admitted at the evidentiary hearing that the reason the police did not try to get a warrant was because "to get a warrant, PRPD must 'conduct several surveillances over a period of days, a lot of photographs, videos; and the process gets complicated.  It's a process that takes a great deal of time.'"  Cruz-Ramos urges us to interpret this testimony as an admission that the police specifically knew that corroboration was generally necessary for probable cause, did not want to put in the work required to get it, and decided to barge into Cruz-Ramos's home anyway.  And the government makes no argument that we should interpret the testimony differently.  Based

on Cruz-Ramos's interpretation of the testimony (which is not contradicted by the district court's findings, and, again, importantly, was not disputed by the government), the officers' disregard of the lack of probable cause was certainly deliberate, such that excluding the evidence would have "[r]eal deterrent value," Davis, 131 S. Ct. at 2427-28, in discouraging future intentional and unlawful police practices. See Krull, 480 U.S. at 348-49; Herring v. United States, 555 U.S. 135, 141 (2009) (noting that the primary purpose of the exclusionary rule is "deterring Fourth Amendment violations in the future").[25]

The Supreme Court has also said, however, that "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Davis, 131 S. Ct. at

---

[25] We note that the record in this case, as it was presented to us, reflects that the good-faith exception does not apply because the police acted in deliberate disregard of the Fourth Amendment. Thus, we need not address today the full extent of the exception's applicability to warrantless searches in general. See Davis v. United States, 131 S. Ct. 2419, 2439 (2011) (Breyer, J., dissenting) (listing scenarios where the good-faith exception has been applied and noting that the good-faith exception has not generally been applied to warrantless searches). Nor need we address whether the exception applies to negligent police mistakes. See Herring v. United States, 555 U.S. 135, 146 (2009) (stating that negligent police mistakes could also be sufficiently culpable to bar application of the good-faith exception, at least "[i]n a case where systemic errors were demonstrated," such that "it might be reckless for officers to rely on an unreliable . . . system"); see also Davis, 131 S. Ct. at 2439 (Breyer, J., dissenting) (noting that if courts "apply the exclusionary rule only where a Fourth Amendment violation was deliberate, reckless, or grossly negligent, then the good faith exception will swallow the exclusionary rule" (internal quotation marks omitted)).

2427. We recognize (indeed, regret) the "substantial social costs" that might come to bear as a result of the vacation of Cruz-Ramos's conviction and his resulting re-trial. See id. As we noted above, the police found several guns in the car, along with an extraordinary amount of drugs (specifically, more than 1,000 decks of heroin, 80 baggies of cocaine, 21 containers of marijuana, 740 vials of crack, and almost 1,000 vials of crack), and it's a hard pill to swallow that none of that evidence can be introduced at Cruz-Ramos's trial.

But the law instructs us that "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. (internal quotation marks omitted). So is the case here, as we cannot overlook the egregious Fourth Amendment violation that occurred. At the end of the day, law enforcement simply cannot cut corners at the cost of a person's constitutional privileges.

We conclude that the exclusionary rule bars the admission of evidence obtained from the illegal search of Cruz-Ramos's house and car.

*Harmless Error*

Even if the evidence was illegally obtained (and even if the police had no good-faith reason to seize it), we will only remand for a new trial if letting in the evidence was not harmless.

United States v. Burgos-Montes, 786 F.3d 92, 114 (1st Cir. 2015). While the government does not address this issue in its brief,[26] we conclude that the introduction of the seized evidence in this case was not harmless.

Since the error here "rises to the level of constitutional," we must assess whether "we can consider the error harmless beyond a reasonable doubt." United States v. Trenkler, 61 F.3d 45, 60 n.22 (1st Cir. 1995). We must find, then, that beyond a reasonable doubt, it is "highly probable that the result would have been the same" if the error had not occurred. United States v. Leon-Delfis, 203 F.3d 103, 112 (1st Cir. 2000) (internal quotation marks omitted). "We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of." United States v. Argentine, 814 F.2d 783, 789 (1st Cir. 1987). Instead, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id.

---

[26] We have the discretion to address harmless error sua sponte in certain situations, but we remind the government that it "bears the burden of persuasion with respect to showing that the error was harmless." United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997). We will not fret over whether it is appropriate to exercise our discretion to address harmlessness here despite the government's failure to raise it because the argument would have failed anyway.

Cruz-Ramos points out (and the government does not dispute) that the evidence seized from Cruz-Ramos's car -- seven guns, and more drugs than we care to recount -- was the only physical evidence at trial that directly connected Cruz-Ramos to La ONU activities (or to any drug trafficking). As far as we can tell, without this physical evidence the only other evidence connecting Cruz-Ramos to anything illegal was the testimony of the cooperators, which they provided in exchange for leniency in their own cases. Further, as Cruz-Ramos points out, even if we take the witnesses at their word, their testimony did not make for a slam-dunk for the government by any means -- for instance, while Gutierrez-Santana initially said that Cruz-Ramos was at the planning meeting for Pequeque's murder, he later (unequivocally) testified on cross that Cruz-Ramos was not there. See United States v. Bosch, 584 F.2d 1113, 1123 (1st Cir. 1978) (considering that the "government's case consisted primarily of the testimony of admitted accomplices, whose credibility was attacked" in finding that a constitutional error was not harmless); United States v. Ofray-Campos, 534 F.3d 1, 27-28 (1st Cir. 2008) (in harmless beyond a reasonable doubt analysis, considering that no physical evidence tied defendant to drug activity); Coppola v. Powell, 878 F.2d 1562, 1571 (1st Cir. 1989) (noting that there was "no conclusive evidence that tie[d] petitioner tightly to the crime," and that it did not suffice that "it [was] probable that

petitioner committed the crime").  Thus, we simply cannot say beyond a reasonable doubt it is "highly probable" that the jury would have reached the same verdict without the wrongly admitted physical evidence.  See Leon-Delfis, 203 F.3d at 112; cf. United States v. Jiménez, 419 F.3d 34, 42 (1st Cir. 2005) (finding harmless error when erroneously admitted evidence "pale[d] in light of the other evidence introduced at trial"); United States v. Crooker, 688 F.3d 1, 9 (1st Cir. 2012) (finding harmless error where drug residue was illegally obtained, but the government "presented a wealth of other evidence," including bags of drugs, drug paraphernalia, and the defendant's confession that he used and possessed drugs).

All in all, neither the good-faith exception to the exclusionary rule nor the harmless-error doctrine apply here. Therefore, Cruz-Ramos is entitled to a new trial, and the evidence that was illegally seized from his home cannot be introduced.

### Cruz-Ramos's Statement

We are left with one unresolved issue concerning the motion to suppress.  While, as we discussed above, it's clear that the physical evidence seized during the illegal search of Cruz-Ramos's home should have been suppressed, whether Cruz-Ramos's statements to the police should have been too is a tad trickier since the statement was provided after the search of the house.

In examining this more complicated question, we generally look at "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488 (internal quotation marks omitted). The district court did not undertake this inquiry, given its finding that the search was legal. Further, the government does not address this issue (along with numerous others) at all in its brief (meaning it is likely waived). However, because this question "depends primarily upon weighing the facts in the particular case, . . . and is thus a matter especially suitable for resolution by the district court in the first instance," United States v. Acosta-Colon, 157 F.3d 9, 21 (1st Cir. 1998) (internal quotation marks omitted), we think it appropriate that the district court address this issue on remand. See id.; United States v. Cordero-Rosario, 786 F.3d 64, 78 (1st Cir. 2015).

For the reasons discussed, we must reverse in-part the district court's denial of the motion to suppress, vacate Cruz-Ramos's conviction, and remand his case for further proceedings consistent with this opinion. Because we find that Cruz-Ramos is entitled to a new trial based on suppression error, we need not address his other allegations of reversible trial or sentencing errors.

We move on to the grievances pressed by his cohorts.

**B. Jury Issues**

Having resolved Cruz-Ramos's appeal, we turn now to the issues raised by Laureano-Salgado and Ramírez-Rivera. We start with their qualms with jury selection.

Anonymous Empanelment

First up, the Defendants claim that the district court erred in empaneling an anonymous jury, arguing that it violated their Sixth Amendment right to a public trial before an impartial jury.

We review this claim for abuse of discretion. United States v. DeLuca, 137 F.3d 24, 31 (1st Cir. 1998). "Our review takes into account not only the evidence available at the time the anonymous empanelment occurred, but all relevant evidence introduced at trial." Id.

Let's review the legal backdrop for the Defendants' claim. "It is constitutional bedrock that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.'" Sampson v. United States, 724 F.3d 150, 163 (1st Cir. 2013) (quoting U.S. Const. amend VI). To protect this important right, certain safeguards are generally put in place during jury selection. For instance, jurors' names and some other identifying personal information are made available

to the parties (and sometimes to the public).  See 28 U.S.C. § 1863(b)(7).

However, "a district court may empanel an anonymous jury in any case in which 'the interests of justice so require.'" United States v. Marrero-Ortiz, 160 F.3d 768, 776 (1st Cir. 1998) (quoting 28 U.S.C. § 1863(b)(7)).  Because "empanelment of an anonymous jury should be recognized as an extraordinary protective device, especially if it tends to suggest that the jurors may have something to fear from the accused, thereby conceivably encroaching upon the presumption of innocence," DeLuca, 137 F.3d at 31, we have held that empaneling an anonymous jury "is a permissible precaution" only when two requirements are satisfied: "(1) there are strong grounds for concluding that it is necessary to enable the jury to perform its factfinding function, or to ensure juror protection; and (2) reasonable safeguards are adopted by the trial court to minimize any risk of infringement upon the fundamental rights of the accused." Id.

Considering both of these factors, we find that the district court acted well within its discretion to empanel an anonymous jury in this case.  On the "strong grounds" prong, we have considered a variety of factors in looking at whether this standard has been satisfied.  For instance, we have chewed over the defendants' link to organized crime, "a factor which strongly indicate[s] that clandestine outside assistance might be brought

to bear in any effort to intimidate or punish jurors"; the defendants' involvement in violent crime; their attempts to witness tamper; and the potential for "mandatory lifetime sentences upon conviction, which surely provide[s] a strong inducement to resort to extreme measures in any effort to influence the outcome of their trial." Id. at 32 (alterations omitted). Ultimately, though, we assess whether the "record as a whole affords sufficient foundation for empaneling an anonymous jury both as a prudent safety precaution and a means of ensuring unfettered performance of the factfinding function." Id.

Here, the indictment alleged -- and the evidence proved -- that the Defendants were part of an organized drug-trafficking ring that freely used violence (read: murder) to get its way.[27] See Marrero-Ortiz, 160 F.3d at 776 (noting that "[t]he indictment charged the appellant and his coconspirators with membership in a sprawling drug ring that often resorted to violence in its pursuit

---

[27] We note that the Defendants do not take issue with the district court's factual findings in this regard, but only with the manner in which the court weighed the facts and the source of the facts (i.e., the indictment). To that end, while the Defendants argue that the district court improperly relied on allegations the government made in the indictment to empanel the jury anonymously, as we noted above, in reviewing this claim we look to all the evidence introduced at trial -- not just the facts that were available at the time of empanelment. The Defendants simply ignore that legal principle. Further, the judge may consider a variety of other sources of information, including the indictment and evidence proffered by the government. See United States v. Marrero-Ortiz, 160 F.3d 768, 776 (1st Cir. 1998).

of profits"). Not even police were excepted, and La ONU certainly did not look kindly on people who cooperated with the government (remember, one of the organization's rules was to kill anyone who cooperated with the police). Further, the government proffered to the court that incarcerated La ONU members were able to call people on the outside using phones they had illegally obtained in prison, meaning, as the district court found, that "the reach of La ONU extend[ed] outside the federal correctional facilities and present[ed] a real risk to jurors." In addition, the Defendants faced mandatory life sentences if convicted. These facts provided ample fodder for the district court's reasoning that "strong grounds" called for anonymous empanelment.

The district court also adopted reasonable safeguards to minimize infringement on the Defendants' constitutional rights. Rather than bring up any concern for the jurors' safety, the judge told the jurors that they would remain anonymous to avoid media interference. He instructed the jurors that the Defendants were to be presumed innocent no fewer than four times during the course of jury selection. He also informed the jurors that while he would read portions of the indictment to give them a flavor of the case, the indictment was not "evidence of guilt or of anything else." See id. (finding that Judge Fusté, the same judge who empaneled the jury in this case, "took satisfactory precautions to protect the defendants' rights" when he "did not mention any threat to

juror safety, but, rather, informed the jurors that they would remain anonymous during the trial because of publicity concerns. He then instructed the jury on the presumption of innocence, and periodically repeated that instruction as the trial progressed.").

Finding no error in the district court's decision to empanel an anonymous jury, we move on to the next issue.

## Voir Dire

The Defendants' next claim is that the district court mishandled voir dire, insofar as the court did not appropriately probe into the jurors' possible biases. Specifically, the Defendants refer to three supposed problems: (1) Juror No. 56, who, according to the Defendants, raised her hand when the court asked about the jury's familiarity with the helicopter shooting, was not asked any follow-up questions; (2) after the jury was seated, the court disclosed that one juror lived in Trujillo Alto municipality, which was nearby the 2010 La ONU-La Rompe shootout that led to the death of a police officer and civilian bystander; and (3) the court did not sufficiently vet whether all the jurors could speak and understand the English language. Essentially, then, the Defendants raise two separate issues -- one, should the court have asked additional questions during voir dire? And two, should certain jurors have been excused for bias? We assess each of these questions in turn.

*Additional Questioning*

We review the first issue -- the district court's handling of voir dire -- for abuse of discretion.[28]  See United States v. Orlando-Figueroa, 229 F.3d 33, 44 (1st Cir. 2000) ("Because voir dire determinations rely largely on immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the voir dire." (internal quotation marks and alteration omitted)).

Upon assessing the record, we find that no abuse of discretion occurred here simply because the court declined to ask the jurors more voir dire questions to appease the Defendants. While "[a] probing voir dire examination is [t]he best way to ensure that jurors do not harbor biases for or against the parties," Sampson, 724 F.3d at 163-64 (internal quotation marks omitted), "a district court need not . . . pose every voir dire question requested by a litigant." Orlando-Figueroa, 229 F.3d at 44 (internal quotation marks omitted).  "It is more than enough if the court covers the substance of the appropriate areas of concern by framing its own questions in its own words."  Id.

---

[28] The parties do not address whether the Defendants sufficiently contemporaneously objected to the grievances with jury selection they now press on appeal.  While generally we review unpreserved objections for plain error, because the government did not ask us for plain error review (and because the Defendants' claims fail under either standard anyway), we will review the Defendants' claims for abuse of discretion.  See United States v. Tapia-Escalera, 356 F.3d 181, 183 (1st Cir. 2004).

Here, the district court asked the potential jurors whether any of them had knowledge of the helicopter shooting. The court followed up with each person who raised his or her hand in response. While the judge indicated that he was taking notes as to which jurors raised their hands, when defense counsel stated that he thought the court had missed the fact that "Juror 54" had raised her hand,[29] in an abundance of caution, the judge asked the jurors again whether any of them had heard of La ONU, La Rompe, the helicopter shooting, or the Trujillo Alto bridge shooting. No hands were raised. Asking the question again was sufficient remedy for ensuring that the judge did not miss any hands (particularly because this was precisely the remedy the defense asked for during voir dire).[30]

---

[29] While neither side addresses this in their briefs, we assume that it was later clarified that the juror who raised her hand was actually Juror 56, not Juror 54.

[30] Contrary to Cruz-Ramos's counsel's representation at oral argument, our review of the record shows that the district court did not improperly pose the helicopter-shooting question. After expressing reservation about asking a question about the incident, the judge consulted with counsel to get their take on the issue. Upon deciding to ask the question, the judge clarified with the jurors that the Defendants were not charged with the helicopter shooting, but because La ONU was "associated . . . with that incident," anyone who had "read or seen anything touching about the group of people known as La ONU or . . . La Rompe ONU" should raise their hands. Indeed, one juror indicated that she had read or heard about the case in the news and that the name "La ONU" "rings a bell."

As to the juror who lived in Trujillo Alto, the Defendants contend that the court should have asked prior to seating the jury where each juror resided, because people who lived near the area of the Trujillo Alto shooting "would have been greatly affected and scared by the . . . incident."  As we noted above, the court asked the jurors whether they had heard of the Trujillo Alto shooting -- a much more appropriate question to ask if the concern is that people who were aware of the shooting would be afraid of the Defendants.

Concerning the jurors' language abilities, the court did not abuse its discretion by declining to further inquire into the jurors' English-language skills.  When defense counsel expressed concern that one particular juror had trouble understanding English, the court probed further with the juror, who answered all of his questions in English.  In particular, when the judge asked what kind of jury service that juror had done in the past, the juror explained, "[o]ne criminal case."  When the Defendants later raised the juror's language skills again with the court (a generous assumption, given that all the attorney actually said was, "I was having a hard time understanding her"), the judge indicated that he "understood her perfectly."  Given the "special deference" we afford to the trial court's conclusions that are drawn from its face-to-face interactions with jurors during selection, we find that the court did not abuse its discretion in so determining.

See United States v. Sherman, 551 F.3d 45, 51 (1st Cir. 2008); see also United States v. Lemmerer, 277 F.3d 579, 592 (1st Cir. 2002) ("Our cases make clear that the judgment of the trial judge, who can appraise the jurors face to face, deserves great weight." (internal quotation marks and alteration omitted)). The Defendants also have not directed us to any other jurors for which they had language-comprehension concerns. See Orlando-Figueroa, 229 F.3d at 45 (finding no abuse of discretion where "defendants do not point to any evidence that any juror's ability to understand English was deficient").

*Bias*

To the extent the Defendants argue (however sparsely) that Juror 56 and the juror from Trujillo Alto should have been dismissed because of their bias against the Defendants, we reject that claim as well.[31]  As we discussed above, a defendant is guaranteed by the Constitution an impartial jury. And to be sure, a defendant's right to be tried by "an impartial jury is an integral component of a fair trial" that "must be jealously

---

[31] Neither side bothers to try to clarify this confusion for us, but our review of the jury selection transcript shows that Juror 56 was initially excused. Then, while the court was in the process of selecting the jurors who would be seated, one of the attorneys asked why Juror 56 was excused. For reasons the transcript doesn't reflect, the juror was brought back and seated as an alternate. According to the Defendants, however, Juror 56 ended up deliberating.

safeguarded." Sampson, 724 F.3d at 160 (internal quotation marks and alteration omitted). But "[o]ur usual standard of review once the trial judge has made an appropriate inquiry is an abuse of discretion standard, which recognizes that the district court has wide discretion in deciding how to handle and how to respond to allegations of juror bias and misconduct that arise during a trial."[32] United States v. Martí-Lón, 524 F.3d 295, 300 (1st Cir. 2008) (internal quotation marks and alteration omitted). As to Juror 56, as we discussed above, the district court sufficiently probed with the jurors whether they were familiar with the helicopter shooting, despite the fact that the defense was not even sure that the juror had raised her hand (and the judge's notes did not reflect that she had). Still, the court provided a cautionary remedy -- the very remedy the defense asked for -- when this issue came up during voir dire, that is, to ask the jurors the question again. No one raised a hand. "[W]e give great weight to the judgment of the trial judge, who can appraise the jurors face to face, as to whether the juror can be impartial," id. (internal quotation marks omitted), and the Defendants have given

---

[32] "Bias" means that a "reasonable judge," considering all the facts and circumstances, would determine that "the juror lacked the capacity and the will to decide the case based on the evidence (and that, therefore, a valid basis for excusal for cause existed)." Sampson v. United States, 724 F.3d 150, 165-66 (1st Cir. 2013).

us no reason to stray from that principle here.  Likewise, as we noted above, the Defendants have provided no explanation for why we should assume the juror from Trujillo Alto would be biased against them simply because she lived in Trujillo Alto (even though she had not heard of the bridge shooting).  The district court did not abuse its discretion during voir dire.

### Right-to-be-Present and Juror Misconduct

Next, the Defendants argue that the district court committed per se reversible error in its handling of Juror 30, who asked to be excused prior to the start of trial because of her fear of the Defendants.  They argue that the court should not have prohibited them from being present during the juror's in camera interview.  They also say that the district court should have polled the other jurors to ensure Juror 30 did not taint them with her bias.

We review the right-to-be-present claim de novo.  United States v. Brown, 669 F.3d 10, 32 (1st Cir. 2012).  Further, "the exclusion of a defendant from a trial proceeding should be considered in light of the whole record."  United States v. Gagnon, 470 U.S. 522, 526-27 (1985).  We review the denial of the jury polling for abuse of discretion.  See United States v. Villar, 586 F.3d 76, 82 (1st Cir. 2009) (citing United States v. Connolly, 341 F.3d 16, 33-34 (1st Cir. 2003) ("[T]he district court's response

to an allegation of juror misconduct is generally reviewed only for abuse of discretion.")).

We first address whether the district court erred by excluding the Defendants from the in camera interview. A defendant's constitutional right to be present during his trial proceedings largely derives from the Sixth Amendment, which, as we noted above, guarantees the defendant a "speedy and public trial, by an impartial jury," as well as the right "to be confronted with the witnesses against him." See Gagnon, 470 U.S. at 526. However, the Supreme Court has "recognized that [the] right [to be present during trial proceedings] is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him," id., such as jury empanelment. This due process protection exists only when "a fair and just hearing would be thwarted by [the defendant's] absence, and to that extent only." Id.

Thus, the high Court has articulated that a defendant only "has a due process right to be present at a proceeding" when "his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." Id. (internal quotation marks omitted). In other words, "[a] criminal defendant has a constitutional right to be present at all stages of the trial where his absence might frustrate the fairness of the

proceedings." United States v. Fernández-Hernández, 652 F.3d 56, 65 (1st Cir. 2011) (internal quotation marks omitted).

Of course, jury empanelment falls into this category. See id. (noting that "defendant must be present at 'every trial stage, including jury impanelment,' except at stages where . . . '[t]he proceeding involves only a conference or hearing on a question of law'" (quoting Fed. R. Crim. Pro. 43(a)(2), (b)(3) (citation omitted))). But contrary to the Defendants' position that an exclusion from a court's in camera interview is a per se constitutional violation, both the Supreme Court and this court have held that a defendant's temporary exclusion during an in camera questioning of a juror, where defense counsel is present, does not automatically offend a defendant's constitutional rights. Gagnon, 470 U.S. at 526 (noting that the "defense has no constitutional right to be present at every interaction between a judge and a juror" (internal quotation marks omitted)); Fernández-Hernández, 652 F.3d at 65-67 (finding that a defendant's absence from a bench conference during voir dire did not "deprive him of any constitutional right"). Here, the fairness of the proceedings were not frustrated by the court's decision to exclude the Defendants from the in camera conference with Juror 30. While the Defendants argue that they could have consulted with their attorneys on "possible questions to present to the Court so it could ask Juror #30 on the possible contamination of other jurors,"

as the district court noted in its decision on this issue, the jury had not yet convened such that the juror could contaminate the other jurors.  In addition, the court asked the juror whether she knew any of the other jurors, or had even interacted with any of them, and she "indicated in clear and decisive terms that she did not communicate her fears or anxieties to any other member of the jury."  The Defendants have presented us nothing that might refute that finding.  They also have provided no indication that their interests were not sufficiently protected by their counsel's presence during the interview.[33]  See id.  Thus, the court did not err in excluding the Defendants from the in camera conference.[34]

---

[33] While the court invited all of defense counsel to be present at the interview, one attorney (Cruz-Ramos's) did not show because of a scheduling conflict.  This fact does not change our holding. The attorney's position on this issue (as submitted in writing) did not differ from his co-counsel's, and the attorney did not submit any additional questions for the court to ask the juror during the interview.  Further, the Defendants have not argued that the attorney's inability to be at the interview warrants reversal -- only that their own does.

The Defendants also fail to address what they "could have done . . . had they been at the conference," or how they would "have gained anything by attending."  United States v. Fernández-Hernández, 652 F.3d 56, 66 (1st Cir. 2011) (internal quotation marks omitted).  As we discuss below, the Defendants were not entitled to an individualized questioning of each juror.  And given that the district court ended up dismissing Juror 30, the Defendants do not tell us what other relief they would have wanted.

[34] The Defendants also argue that allowing the juror's husband to be present during the interview was also reversible error because it is possible that he "might have a chilling effect" on the juror's responses.  We are troubled by a practice of allowing a relative of the juror to attend an in camera conference when other members of the public, and the Defendants themselves, were

We also reject the Defendants' claim that the court should have individually questioned each juror to determine whether Juror 30's bias against the Defendants contaminated the other jurors. "When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." United States v. Ortiz-Arrigoitia, 996 F.2d 436, 442 (1st Cir. 1993). But "the trial judge is vested with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct actually occurred and whether it was prejudicial." Id. at 443. "Substantial deference is due the trial court's exercise of its discretion," United States v. Angiulo, 897 F.2d 1169, 1185 (1st Cir. 1990), and the "deference due the court's ultimate finding on the issue of continued juror impartiality is enhanced because this determination is a question of fact," United States v. Barone, 114 F.3d 1284, 1307 (1st Cir. 1997).

Even assuming (without deciding) that the Defendants' suggestion that Juror 30 biased the rest of the jury is non-frivolous (a point we seriously doubt, given the fact that the jurors had not yet sat together at trial), we find that the

excluded. But still, the Defendants have provided no law (or otherwise developed argument) that the district court violated their constitutional rights. See Zannino, 895 F.2d at 17.

- 73 -

district court probed enough to assure itself that Juror 30 did not taint the other jurors.  As we noted above, the Defendants have provided no suggestion even that Juror 30 communicated or interacted with the other jurors, let alone that she had communicated to them her anxiety about sitting on the jury.  See United States v. Maceo, 873 F.2d 1, 6 (1st Cir. 1989) (noting that the "the defendant has the burden of proving prejudice or jury bias").  Furthermore, the Defendants have not shown (or suggested) that even if Juror 30 communicated her anxiety to the other jurors, the other jurors actually became biased as a result, such that they would have to be excused from the jury.  See Sampson, 724 F.3d at 165 ("Jurors normally are subject to excusal for cause if they are biased or if they fail to satisfy statutory qualifications.").

Seeing no merit in the Defendants' claims regarding jury selection, we turn to their next set of arguments.

## C. Evidentiary Rulings

Next on the list, the Defendants dispute a number of the district court's evidentiary rulings made during the trial, arguing that they amounted to reversible error.

We review a trial court's objected-to evidentiary rulings for abuse of discretion.  United States v. Rodríguez-Berrios, 573 F.3d 55, 60 (1st Cir. 2009).  Likewise, a trial court's determination of whether evidence is more probative than

prejudicial is also reviewed for abuse of discretion.  See United States v. Walker, 665 F.3d 212, 229 (1st Cir. 2011).  We stay "mindful that the trial judge has savored the full taste of the fray, and his considerable discretion must be respected so long as he does not stray entirely beyond the pale."  United States v. Rodríguez, 215 F.3d 110, 121 (1st Cir. 2000) (internal quotation marks omitted).

## Figueroa-Viera Impeachment

Say Defendants, the district court should have allowed them to impeach the government's star witness (Figueroa-Viera) with evidence that he was untruthful during his plea negotiations. Specifically, the Defendants refer to Figueroa-Viera's testimony that after he was arrested for his drug-trafficking activities with La ONU, he pleaded guilty to the charges brought against him. He signed a plea and cooperation agreement with the government in exchange for a reduced-sentence recommendation.  The cooperation agreement required that Figueroa-Viera disclose "all information known to [him] regarding any criminal activity."  It also required that he "agree[] to provide truthful, complete and accurate testimony, information on a continuing basis and as required by [the] United States."

On cross, defense counsel attempted to question Figueroa-Viera about his plea agreement.  The attorney asked:

> Q: And the fact is that during that interview [with the government], you didn't tell [law enforcement] all of the murders that you have committed in Puerto Rico?

The government objected, which the court sustained, letting defense counsel know that he could try again if he could lay a foundation for the question.

The defense showed the witness a copy of his plea agreement and continued:

> Q: And, in fact, in that document, you agreed to cooperate with the government and to provide all information known to the defendant regarding any criminal activity, including but not limited to the offense described in the pending indictment; is that right?
>
> A: Yes.
>
> . . .
>
> Q: So I ask you now whether it isn't true that you were not completely truthful in providing the agent all of the information regarding your past criminal activities, including murder, or anything about murder in Puerto Rico?
>
> A: Yes.

Before continuing with his questions, and to head-off another round of objections, the attorney asked for a sidebar to proffer the foundation for his next line of questions. The attorney explained that defense investigators had uncovered that Figueroa-Viera had killed someone during a 2011 bakery hold-up,

- 76 -

which he did not disclose to the government in violation of his plea agreement. The government objected, arguing that this line of questioning was forbidden by Federal Rule of Evidence 608(b), as evidence that the witness committed a murder was a specific instance of conduct not probative of the witness's truthfulness (more on Rule 608(b) in a little bit).

The court, however, acknowledged that if the witness had not adhered to the plea agreement's requirement that he provide accurate information to the government, his failure to disclose his criminal activity could go to his credibility. Thus, the court ruled that the defense could "ask the witness whether he has complied with this agreement and answered all the questions truthfully and provided accurate answers to the government investigators." Per Rule 608, however, the defense could not ask questions about the bakery murder because it constituted a "specific instance of conduct" that the defense was attempting to use to impeach the witness. Also acknowledging that the witness's answer to the last-asked question was unclear (the court interpreted the witness's "yes" to mean that he was not completely truthful to the government, while the government interpreted the witness to mean the opposite), the court also allowed the defense attorney to go back and clarify that particular question.[35]

---

[35] Despite this confusion, the defense attorney apparently did not think it was necessary to ask the question again, asserting

Now Federal Rule of Evidence 608(b) says that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." However, the rule says that the court may, "on cross-examination, allow [the specific instances of conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." The Defendants argue that the court should have allowed further cross-examination because "[a] witness' response to a question whether he told the truth on a previous occasion could well be probative of his character for truthfulness."

But the Defendants do not tell us what more they wanted to ask Figueroa-Viera to probe his truthfulness. Whether Figueroa-Viera committed the bakery murder does not tell anything of his tendency to be truthful, unless he was required to tell the government about the murder and did not. Indeed, the district court allowed the defense to ask about whether Figueroa-Viera disclosed to the government all the murders he committed in Puerto Rico, and this question goes right to the heart of whether the

---

that the government should "clarify that in the redirect, not me," since "it's the government that's alleging there's some confusion in the record." The government did not accept the invitation.

witness was truthful in his dealings with the government.[36]  Thus, while Rule 608 leaves the court the discretion to allow the specific instances of conduct to be probed, the Defendants do not tell us how the specific details of the murder -- as opposed to the details of the witness's communications with the government -- would be probative of the witness's character for truthfulness. See Tigges v. Cataldo, 611 F.2d 936, 938 (1st Cir. 1979) ("[S]ince the past conduct was not, in and of itself, 'probative of truthfulness or untruthfulness,' plaintiff could not have cross-examined [the witness] directly on the subject of the [past] incident." (citation omitted)).  Furthermore, while acknowledging that Rule 608 makes discretionary the district court's choice to allow cross-examination on specific instances of conduct, the Defendants made no developed argument as to why the court was required to do so here.  See id. at 939 ("The court . . . has considerable discretion to exclude avenues of cross-examination

---

[36] To be sure, whether the witness intended to disclose that he was not totally forthcoming with the government remains a mystery, given the way the defense attorney asked the question. But we suspect the witness meant to testify that he was truthful -- during a carefully worded re-direct, the government asked the witness whether the plea agreement required him to "tell the complete truth" (to which the witness responded "yes") and "what would have happened" if he did not "say the complete truth."  The witness responded:  "Everything I said would be used against me," and "I couldn't cooperate anymore."

which promise to lead far afield from the main controversy.").[37] The district court did not abuse its discretion in restricting this particular line of questioning.

### Uncharged "Pep Boys" Murder

Next, the Defendants claim that the district court should not have let in testimony about a murder that the Defendants were not charged with. The Defendants claim that this evidence was introduced only to rile up the jury.

Specifically, Defendants refer to testimony regarding a murder that occurred in January 2010 behind a Pep Boys auto parts store, when two La ONU leaders ordered the killing of a La Rompe boss. As far as we can tell, none of the Defendants were personally involved in that murder.

Federal Rule of Evidence 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact

---

[37] The Defendants also claim that the prosecutor improperly vouched for Figueroa-Viera's testimony when he asked about the terms of Figueroa-Viera's plea agreement by suggesting that the information the witness provided to the government had been verified. But Defendants concede that this objection was not preserved below, and is therefore subject to plain-error review. See United States v. Pulgarin, 955 F.2d 1, 2 (1st Cir. 1992). Still, the Defendants do not attempt to show how they have satisfied the plain-error standard, particularly given that Defendants have provided no caselaw from our circuit on the point. See United States v. Correa-Osorio, 784 F.3d 11, 22 (1st Cir. 2015) (describing a plain error as "an indisputable slip up on the judge's part, given controlling precedent" (internal quotation marks omitted)).

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." And we have previously held that when the scope of a RICO conspiracy includes murder as a tool to further the enterprise, a "murder [is] still relevant to the RICO counts as it tended to prove the existence and nature of the RICO enterprise and conspiracy," even when all the indicted defendants are not charged for the particular killing. United States v. DeCologero, 530 F.3d 36, 54 (1st Cir. 2008). Here, cooperating witness Figueroa-Cancel testified that the reason he participated in the Pep Boys murder was because La ONU leaders instructed him to, and "if the leader ordered us to kill anybody, we had to do it." This testimony was relevant to framing the structure of the La ONU enterprise (i.e., that La ONU did, in fact, have leaders and that subordinate members were to obey their orders), and corroborated the other testimony regarding the rules and mission of the enterprise (i.e., that La Rompe members were to be killed on-sight). Thus, we do not agree with the Defendants that the Pep Boys evidence was not relevant to the RICO count.

Even relevant evidence may be excluded sometimes, though, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

- 81 -

The Defendants launch a Rule 403 attack on the Pep Boys evidence based on unfair prejudice, but we reject that argument too. "Usually, courts use the term 'unfair prejudice' for evidence that invites the jury to render a verdict on an improper emotional basis." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000). The Defendants have made no effort to explain to us why the Pep Boys evidence was unfairly prejudicial. See id. ("We stress 'unfair' because by design, all evidence is meant to be prejudicial." (internal quotation marks and alteration omitted)). Given the nature of this violence-infested case, we see no reason why testimony about an additional murder would cause the jury an improper emotional reaction, and the Defendants have not provided any reason. We find that the district court did not abuse its discretion in letting in this evidence.[38]

---

[38] Defendants additionally argue that the testimony of the Pep Boys murder should not have been allowed under Rule 404(b). But that rule bars introduction of "[e]vidence of a crime, wrong, or other act" introduced "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Given that the Defendants were not personally involved in the Pep Boys murder, such that the Pep Boys murder would constitute one of their prior bad acts, it is not readily apparent to us (and the Defendants do not explain) how Rule 404(b) would apply here.

We also note that while the Defendants describe witness testimony of other uncharged murders and violent crimes in their factual recitation, they only argue that the Pep Boys murder was impermissibly introduced, and so it is the only uncharged act we address.

In sum, we find that the district court did not abuse its discretion in making the contested evidentiary rulings.

### III.  <u>Multiple Conspiracies v. Single Conspiracy</u>

Turning now to the jury charge, the Defendants argue that the district court erred in declining to give a "multiple conspiracies" instruction.  Similarly, they argue that the indictment varied from the government's case at trial, as the indictment charged only a single conspiracy.

<u>Jury Instruction</u>

"This court reviews a district court's refusal to give a requested jury instruction of this nature for abuse of discretion." <u>United States</u> v. <u>De La Cruz</u>, 514 F.3d 121, 139 (1st Cir. 2008).  "The trial court's failure to give a proffered instruction will not be reversed unless that instruction is (1) substantively correct; (2) was not substantially covered in the charge actually given; and (3) concerned an important point such that the failure to give it seriously undermined the defendant's ability to present a particular defense." <u>Id.</u> (internal quotation marks omitted).  "Under this third requirement, reversal is not required unless a defendant suffers substantial prejudice." <u>Id.</u>

Here, the Defendants requested that the district court instruct the jury that it was possible to find that multiple conspiracies existed in this case, since, according to the Defendants, the evidence indicated that the Defendants were

involved in different schemes within their individual housing projects.[39] The court declined, noting that besides the fact that the Defendants had not submitted any proposed jury instructions for the court to consider, the evidence did not support giving the instruction in any event.[40]

"A trial court should grant a defendant's request for a multiple conspiracy instruction if, on the evidence adduced at

---

[39] Apparently the Defendants did not actually submit a proposed instruction to the court. But generally, a defendant's proposed multiple-conspiracies instruction would go something like this:

> Where persons have joined together to further one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.
>
> In deciding whether a single overall conspiracy as charged in the indictment has been proven beyond a reasonable doubt you should look at whether there were multiple agreements reached, whether there were additions or withdrawals of alleged conspirators, and most significantly, whether the evidence shows beyond a reasonable doubt that all of the alleged conspirators directed their efforts toward the accomplishment of a common goal or overall plan.

See, e.g., United States v. Brandon, 17 F.3d 409, 449 n.68 (1st Cir. 1994) (alterations omitted).

[40] While the government suggested at oral argument that it opposed a multiple-conspiracies instruction, the written record is silent on whether the government objected to the Defendants' request for the instruction.

- 84 -

trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged." United States v. Brandon, 17 F.3d 409, 449 (1st Cir. 1994) (internal quotation marks omitted). In contrast, "[a] single conspiracy exists where the totality of the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a common goal or overall plan." Id. at 450 (internal quotation marks omitted). "Determining the number of conspiracies in a particular case depends on a variety of factors including the nature, design, implementation, and logistics of the illegal activity; the participants' modus operandi; the relevant geography; and the scope of coconspirator involvement." Id. (internal quotation marks omitted).

Problematic for the Defendants is that even if we assume without deciding that the district court should have given the instruction, they have not shown us how they suffered substantial prejudice from the court's failure to do so. "In the context of alleged multiple conspiracies, the defendant's main concern is that jurors will be misled into attributing guilt to a particular defendant based on evidence presented against others who were involved in a different and separate conspiratorial scheme." Id. "The prejudice we must guard against, therefore, is evidentiary spillover resulting from trying defendants en masse for distinct and separate offenses committed by others." Id. Thus, while the

Defendants insist that the evidence showed the existence of an individual conspiracy within each housing project, and that the Defendants' conduct went to benefit those smaller conspiracies and not La ONU, the prejudice we examine is not whether a defendant's conduct might be attributable to a different conspiracy, but rather, whether the conduct of a person from that different conspiracy would be attributable to the defendant. The Defendants do not at all address this prejudice standard; nor do they provide any developed argument as to what specific conduct of other drug dealers (who were involved in other drug conspiracies) might have been attributed to them, such that the jury would not have convicted them without such evidence.[41] To the extent the Defendants intended to argue that all the drug-trafficking activities that came up at trial must be attributed to an organization other than La ONU (with the reason being that La ONU did not engage in its own drug trafficking), we have already rejected their position that La ONU was not a drug-trafficking conspiracy. The Defendants continuously overlook the overwhelming

---

[41] The only specific conduct the Defendants point out is a couple of murders committed by a person named "El Jincho." They claim that Jincho acted on his own in committing those murders and that they were not La ONU-sanctioned. However, the Defendants do not explain why we should assume that Jincho was not acting on La ONU's behalf. As they conceded earlier in their brief, there was trial testimony that Jincho was a La ONU leader and that he ordered that at least one of the murders be committed in retaliation for someone stealing drugs from the organization.

evidence that members of La ONU-controlled housing projects collaborated with each other for the benefit of the greater La ONU good. As we concluded above in our discussion of the RICO count, "the evidence convincingly indicates the existence of a single, unified conspiracy in which all the defendants participated." See Brandon, 17 F.3d at 450.

## Variance

In a similar vein, we reject the Defendants' argument that the trial evidence impermissibly varied from the indicted charges. "A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011) (internal quotation marks omitted). "When a defendant asserts a claim of variance premised on the notion that multiple conspiracies existed and that his activities were not part of the charged conspiracy, the initial question is one of evidentiary sufficiency." Id. (internal quotation marks and alterations omitted). And we have already explained that the evidence was sufficient to find these Defendants guilty of the single La ONU conspiracy.

On to the last issue.

## IV. Sentencing

Finally, we reach the Defendants' inevitable claims of sentencing error. Surprisingly there is only one -- the Defendants

argue that the district court should not have concluded that they were subject to mandatory life sentences on Count 29 (the VICAR count) because the jury did not specifically find that they were guilty of a particular statutory element of that offense.

Recall that the Defendants were convicted on Count 29 under 18 U.S.C. § 1959(a)(1), which provides, in relevant part, that:

> Whoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished —
>
> (1) for murder, by death or life imprisonment, or a fine under this title, or both.

Based on this provision, the district court concluded that life sentences on this count were compulsory, since the jury found the Defendants guilty of murdering Pequeque under Puerto Rico law. We review the "district court's application of law at sentencing de novo." United States v. García-Ortiz, 528 F.3d 74, 82 (1st Cir. 2008).

However inarticulately, the Defendants essentially argue that because VICAR does not define "murder," given the statute's relationship to RICO, we should apply RICO's definition of

mandatory-life-imprisonment-eligible murder to determine what counts as mandatory-life-imprisonment-eligible murder under VICAR. That is, since the only type of murder that is subject to mandatory life imprisonment under RICO is murder "for which the maximum penalty includes life imprisonment," 18 U.S.C. § 1963, the same should apply for VICAR. And since the jury here only found the Defendants guilty of "murder," and not necessarily murder for which the maximum penalty includes life imprisonment, the court could not have applied VICAR's mandatory life sentence.[42]

However, the Defendants have not provided any argument as to why we should assume that when applying § 1959(a)(1), we are supposed to adopt the definition of "murder" provided in § 1963; while related to RICO, VICAR is still a separate statute. Thus, we deem this argument waived for lack of development.[43] See Zannino, 895 F.2d at 17.

---

[42] While the Defendants do not explain this in their brief, the backdrop for this argument is that all murder under Puerto Rico law does not appear to be punishable by life imprisonment. Specifically, "first-degree murder" (i.e., premeditated murder) is punishable by 99 "natural years," while all other intentional killings (classified as generic "murders") are punishable by a maximum of 25 years. P.R. Laws Ann. tit. 33, §§ 4733-4735, 4694(a), (c).

[43] Consequently, given that the jury specifically found the Defendants guilty of murdering Pequeque, we need not address the parties' wrangle about whether the verdict form should have further specified whether the jury was finding the Defendants guilty of murder or first-degree murder (as those terms are defined by Puerto Rico law), or murder as otherwise defined therein.

## CONCLUSION

For all of these reasons, we **vacate** Cruz-Ramos's convictions and **remand** his case for further proceedings, consistent with this opinion. We **affirm** Laureano-Salgado's and Ramírez-Rivera's convictions and sentences.